S. Brook Millard (#7415)
WRONA LAW FIRM, P.C.
11650 S. State Street, Suite 103
Draper, Utah 84020
Telephone:  (801) 676-5252
Facsimile:  (801) 676-5262
Email:  millard@wasatchlaw.com
*Attorney for Plaintiffs*

---

## IN THE UNITED STATES DISTRICT COURT FOR THE

## DISTRICT OF UTAH, STATE OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **ELIZABETH WOOD, JERRY WOOD AND BECKY WOOD,** individuals,<br><br>        Plaintiffs,<br><br>vs.<br><br>**FARMINGTON CITY,** a Utah municipal corporation; **DAVIS COUNTY,** a political subdivision of the State of Utah; and **SALT LAKE CITY,** a Utah municipal corporation; and **JOSHUA BOUCHER**, an individual.<br><br>        Defendants. | **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT JOSHUA BOUCHER'S MOTION FOR SUMMARY JUDGMENT**<br><br>Civil No. 2:10-cv-00933-SA<br><br>Honorable Judge Dee Benson |

Plaintiffs, by and through their counsel, S. Brook Millard of Wrona Law Firm, P.C.

hereby respond to Defendant Joshua Boucher's Motion for  Summary Judgment as follows:

## INTRODUCTION

On September 22, 2008, at approximately 9:28 p.m., Davis County Sheriff's deputy

Joshua Boucher served as judge, jury and executioner when he fired the lethal round from his

.308 rifle, ending the life of husband, father, son and firefighter, Brian Wood.  Many of the

events leading up to the killing are in dispute.  What is not in dispute is that the story told by Defendant Boucher does not add up.

Defendant Boucher, without a working radio, his prescription "night" glasses in his pocket, fatigued after being on high alert for 15 hours, his fears intensified by a plan his superiors put into action, while his imagination was clouding his judgment, shot and killed Brian Wood while he was being tased and who did not have a weapon in his hand.  Eyewitness accounts by other officers[1] each tell a different story about those last fateful moments in Brian Wood's life; a story that does not jibe with the physical evidence, the story told by Defendant Boucher and other witnesses.  A non-officer eyewitness, Todd Barton, observed Brian when that fatal shot was taken when he was on his knees being tased without a weapon in his hands.  BW was not a threat when Defendant Boucher used lethal force, and as such, Boucher violated BW's Constitutional rights and is not entitled to Qualified Immunity.

## STATEMENT OF CONTROVERTED MATERIAL FACTS OFFERED BY DEFENDANT[2]

### A. Parties

3.      None of the Plaintiffs were present when BW was shot on September 22, 2008.

**Disputed.**  Jerry and Becky Wood were sequestered from directly viewing the Wood house during the two times that BW was attacked by the police.  However, both Jerry and Becky Wood could hear and see the smoke and sounds of the assault while BW was under attack and

---

[1] Not all officers who were eyewitnesses to the events have been deposed.  Plaintiffs have filed a Motion to Continue under Rule 56(f) of the Federal Rules of Civil Procedure contemporaneously with this opposition as additional discovery is necessary to respond to each and every "fact" alleged by Defendant Boucher in his moving papers.
[2] Defendant's statement of facts includes a number of irrelevant, inadmissible and immaterial information.  However, except as described below, for the purposes of this motion only, Plaintiffs are not contesting those facts.  Plaintiffs' reserve the right to contest all of Defendants' assertions of fact in the future.

ultimately killed by Defendant Boucher.  *See* Affidavit of Jerry Wood at ¶¶13 and 18 attached

hereto as Exhibit "A."

**B.    Event that Occurred Six (6) Months Earlier on March 11, 2008**.

11.    On March 11, 2208, at approximately 1:00 p.m., Officer Knapp heard a knock on

the rear door of the police department.  He opened the door and found Elizabeth standing there:

> She was wrapped in a blanket, her hair was wet, and she was crying.  She indicated that
> her husband BW had assaulted her… Elizabeth stated she was in the shower getting ready
> to go on a trip for work when BW became angry and stated that if she went on the trip the
> marriage was over.  She stated that BW grabbed her arm and brought I around to her
> backside causing her pain and then BW forcibly removed Elizabeth's wedding ring from
> her hand.  I noted at that time that the back of her hand was red, along with her wrist, her
> elbow was red and her should was red…

**Dispute.**  This statement along with 12 through 16 are hearsay statements and not admissible.
None of the information in these statements was taken under oath nor authenticated.

12.    Officer Knapp and Chief Hansen went over across the street to the Wood home,

located at 125 E 100 No.  They knocked but no one answered so they returned to the department

and got Elizabeth's home phone number.  BW answered the phone, stating, "What."  BW stated

he: "had no intentions of ever coming out.  He stated that he 'wasn't going to jail.'  He admitted

to assaulting Elizabeth.  "…He stated that he bent her arm around to the back side of her body

and ripped off her ring.  He indicated that he had hit her as well…  He stated he would not come

and talk with us because he had in fact committed a crime and for that crime he was to serve jail

time, a thing he would not do…"

**Dispute.**  This statement along with 13 through 16 are hearsay statements and not admissible.
None of the information in these statements was taken under oath nor authenticated.

13.    Officer Winkelman also stated that BW had indicated the same thing, that he

would not go to jail  BW said he would "take some officer's[sic] out" if he had to in order to

keep from going to jail.  Lieutenant Whitaker stated that BW had expressed the opinion to him

"that he wanted to end his life."

**Dispute.**  This statement along with 12 through 16 are hearsay statements and not admissible.
None of the information in these statements was taken under oath nor authenticated.

      14.     At that time the officers retreated from the home and went to positions of relative

safety.  Corporal Dale Scow was contacted and negotiated with BW.

**Dispute.**  This statement along with 12 through 16 are hearsay statements and not admissible.
None of the information in these statements was taken under oath nor authenticated.

      15.     Once Corporal Scow was there:

> "Negotiations continued from that time (approximately 20 to 25 minutes [after]
> Elizabeth had come to the police department) until sometime after [5:00 p.m.]
> When Corporal Scow as able to convince BW to give himself up, allowing him to be
> booked into Farmington Jail for Domestic Violence/Assault."  During the last
> Half hour of the conversation with Corporal Scow, Officer Knapp was present.
> "…Brian mentioned more than once that it would be easier 'to take a bullet' than
> To go to jail, indicating that he was suicidal at that time…  We obtained 15
> firearms from the home.  Those were processed into Farmington Evidence… Many
> of the weapons listed in this report had ammunition readily available either next
> to or in the gun…"

**Dispute.**  This statement along with 12 through 16 are hearsay statements and not admissible.

None of the information in these statements was taken under oath nor authenticated.

      16.     After approximately a four (4) hour standoff, the Farmington Police Department

took BW into custody and took possession of fifteen (15) firearms.  In the days that followed,

BW actually called Corporal Dale Scow and told him that the department had not found his AR

15.  BW told Corporal Scow (as well as Officers Richardson and Winkelman) that "if he did not

get his guns back there would be trouble."  On Thursday, March 13, 2008, BW came and met

with Chief Hansen, and they discussed that BW still had the AR 15.  "About five minutes after

his leaving he called me on the phone and told me that I could come to his house and take

possession of the rifle…  I went to his house and he gave the rifle to me.  I brought it to our office and booked into safekeeping.

**Dispute.**  This statement along with 12 through 16 are hearsay statements and not admissible. None of the information in these statements was taken under oath nor authenticated.

20.     Unfortunately, the firearms that were supposed to have remained in Jerry's possession for safe keeping, would include some of the same firearms found back at the Wood residence, or in the possession of, and used by BW in the events of September 22, 2008.

**Dispute.**  Notwithstanding that this statement is not factually based and contains the opinion of the author, Chief Hansen testified that he was not aware of why BW's firearms were released to Jerry Wood or whether BW had the right to have possession of his firearms.  *See* Deposition of Wayne Hansen at pages 9, lines 13-2, 10 1-25, and 11 1-12, portions attached hereto as Exhibit "B."

**C.      Events at Issue on September 21 and Morning of September 22, 2008.**

21.     On September 21, 2008, a Sunday, Elizabeth returned home from a trip.  BW was mad and agitated that Elizabeth had taken bikinis with her and went through Elizabeth's suitcase. BW said a bunch of mean things to Elizabeth and made her feel like a "trashy piece of ass" and so Elizabeth went to pick up their son at Faith Wood's house before going to her mom's house for dinner.

**Dispute.**  Each statement made in paragraph 21 is hearsay, irrelevant, inadmissible and not taken under oath nor authenticated.

22.     While at Faith's house, BW drove there and parked behind Elizabeth's vehicle and he wouldn't let her drive away.  BW put his foot under the tire, and at one point laid on the

5

ground with his legs behind the tire.  Elizabeth waited there until Faith Wood came over and told

him to knock it off.  Elizabeth then went to her mom's house.

**Dispute:**  Each statement made in paragraph 22 is hearsay, irrelevant, inadmissible and not taken

under oath nor authenticated.

      23.     When Elizabeth and JW returned to their home, Elizabeth did not want to sleep in

the same bed with BW, but instead went to sleep in JW's room in his bunk beds.  At that time,

BW came in and starting poking, jabbing, and pulling the covers off of Elizabeth and even

dumped water on her.  Elizabeth refuse to sleep in the same bed as BW, and BW finally said

fine, "I'll be seeing you at your schools tomorrow."  Elizabeth thought that meant BW would

come bug her at her job at school.

**Dispute:**  Each statement made in paragraph 23 is hearsay, irrelevant, inadmissible and not taken

under oath nor authenticated.

      24.     BW then went to bed, and on Monday, September 22, 2208, Elizabeth got up to

take a shower and get ready for work: (interview responses between Elizabeth Wood and Det.

Knapp).

**Dispute:**  Each statement made in paragraph 24 is hearsay, irrelevant, inadmissible and not taken

under oath nor authenticated.

      25.     On September 28, 2011, at approximately 9:19 a.m., BW called 911 dispatch and

said: "yeah, I just beat and raped my wife.  Come get me."

**Dispute:**  Each statement made in paragraph 25 is hearsay, irrelevant, inadmissible and not taken

under oath nor authenticated.

26.     The 911 dispatcher called back and Elizabeth answered the phone.  She was crying and in obvious distress although she claimed everything was fine.

**Dispute:**  Each statement made in paragraph 21 is hearsay, irrelevant, inadmissible and not taken under oath nor authenticated.

33.     When Officer Karpenko arrived on scene, Sergeant Snyder was there.  Deputy Taylor, Deputy Shuler and Deputy Boucher, of the Davis County Sheriff's Office ("Davis County"), each arrived shortly after Officer Karpenko.  Officer Karpenko also heard a very loud gunshot go off where BW was:

> It was one round.  It appeared that Brian had shot a round off from what sounded like a hand gun, while in the truck.  At that time we all stayed behind cover at the front o the residence. …Jerry Wood (father to Brian) was commanded by Lt. Whitaker to exit the property due to agitating Brian even further and possibly making things worse.  Jerry did back off after a considerable amount of time and was placed in a safe area located away from the scene.  [Officer Karpenko] was given the order to back off the scene once SWAT arrived to take over the incident.

**Dispute:**  Each statement made in paragraph 21 is hearsay, inadmissible and not taken under oath nor authenticated.  Moreover, Jerry Wood was on the scene at the time Brian fired a hand gun into trash that had been loaded into a utility trailer in BW's driveway.  See Exhibit "A" Aff. of J. Wood at ¶¶ 5-7.

38.     In those two (2) hours, BW remained in the truck with tow (2) loaded handguns.  BW would point the handgun at his "father – as he would move it across, so as it came up and over and then down out of my view, it would start moving in the direction of his father and then go back down out of view.

**Dispute.**  At no time while Jerry Wood was outside BW's truck pleading with him to come out

did Jerry observe BW point a gun in his direction or make any threatening motions with his gun

toward any person.  *See* Exhibit "A" Aff. of J. Wood at ¶¶ 8 and 9.

### D.  Events During the Afternoon of September 22, 2008

49.      At approximately four (4) o'clock, Deputy Boucher was assigned by the tactical

Operations center as an advanced observer marksman with Officer Merino and Officer Hudson.

**Dispute.**  Officer Merino testified that Defendant Boucher volunteered to serve as a marksman

with Merino and Officer Hudson.  No one has yet to testify who assigned Defendant Boucher

and it is of note that the photograph Assignment Board (Exhibit 21 to Merino's deposition) does

not identify Defendant Boucher as being assigned with Merino and Hudson as marksmen.  *See*

Depo. of B. Merino at pg. 120 lines 8-19 excerpts attached as Exhibit "C" and Assignment Board

photo attached as Exhibit "D."

### E.  Events During the Evening of September 22, 2008.

52.      During the invocation of the deliberate action plan, it was Deputy Boucher,

Detective Merino, and Officer Hudson's job to "continue in the position that we were in to

provide cover for the teams that were up close and provide cover for the deliberate action teams

when the plan was set in place and initiated."   It was their duty to "try and find what Brian

Wood's position was and to continue our job to provide cover and his location for those teams.

Because of our rifles being precision rifles, if they needed to be used, that was our job."

**Dispute.**  There is no evidence that anyone in command actually assigned Defendant Boucher

but that he volunteered to Officer Merino. *See* Depo. of B. Merino at pg. 120 lines 8-19.

53.      Officer Hudson testified:  "When the operation began, the subject appeared to

be overwhelmed but he did not drop the gun.  He turned to the North keeping the gun close to

him.  He was hit with multiple 37 mm exact impact rounds and multiple paint balls containing

CS gas but did not drop the gun…  Due to the NFDD's having a great deal of smoke, I could not

see the subject any more.  When the smoke began to clear, I still could not see the subject.  I

grabbed my sniper rifle and moved to where the team was attempting to disarm the subject.  Det.

Merino and Deputy Boucher were also there.  I saw the subject had placed himself behind a

trailer which was the furthest North West vehicle in the driveway…  Deputy Boucher was next to

me on my left (west of) and I told him to come to the other side of me at which time he got into a

position with one of the teams behind a bunker…  I traveled to the yard West of the residence

where there had been a ladder prepped…  As I came over the fence, I saw the subject sitting up

and it appeared that he was attempting to point the handgun at the teams at the end of the

driveway to the south.

I brought my rifle over the fence with every intention of firing at the subject to prevent death or

serious bodily injury to the other operators.

**Dispute.**  Todd Barton testified that BW did not have a gun in his hand when Defendant Boucher

shot and killed BW.  Moreover, Officer Hudson did not in fact shoot BW.  *See*  Depo. of Todd

Barton at pgs. at pgs. 86 lines 13-25; 87 lines 1-25 excerpts attached as Exhibit "E" and Depo. of

J. Hudson at pg. 90 lines 2-10 excerpts attached as Exhibit "F."

      54.     In his deposition, Officer Hudson testified:

Q.  BY MR. CRANE: If Deputy Boucher had not shot Brian Wood, would you have?

A.  THE WITNESS: Yes.

Q.  BY MR. CRANE: Why?

    A.  THE WITNESS: He was pointing his handgun right at the team that I'd just left.  I didn't know if they could see it or not.  I was going to acquire the best sight I could and end the threat.

**Dispute.**  As noted above, Todd Barton testified that BW did not have a gun in his hand when Defendant Boucher shot and killed BW.  Moreover, Officer Hudson did not in fact shoot BW.  *See*  Depo. of Todd Barton at pgs. 86 lines 13-25; 87 lines 1-25 and Depo. of Justin Hudson at pg. 90 lines 2-10.

    55.    As Officer Hudson had noted, just before he ran across the street, Detective Merino and Deputy Boucher had moved across the street to continue with their job of communicating and providing cover for the teams.  Detective Merino and Deputy Boucher changed as officers were reporting that they could not see BW.  They were providing cover for the other officers and it was their duty to maintain "eyes" on BW.

**Dispute.**  Although Defendant Boucher did go across the street during the deliberate action attack on BW, he went without wearing his glasses that he is required to wear at night and without an operable radio.  *See* Depo. of Joshua Boucher at pgs 95 lines 6-11; 97 lines 5-24; 98 lines 1-25; 102 lines l8-25; 103 lines 1-25 excerpts attached as Exhibit "G."

    57.    Furthermore, Officer Marshall was already across the street at that time that Deputy Boucher joined him.  During the deliberate action plan, Officer Marshall testified that Deputy Boucher was right beside him, that Officer Marshall heard over the radio the call of shots fired, and Officer Marshall observed BW pointing the gun directly at them.

**Dispute.**  Although statement 57 accurately reflects Officer Marshall's testimony, it omits the fact that Officer Marshall testified that he did not hear a shot fired nor did he see a flash from the muzzle of BW's gun and that when he heard the call over the radio of shots fired BW's gun was

not aimed toward he and Officer Boucher.  *See* Depo. of Dustin Marshall at pgs. 189 lines 16-25; 239 2-7; 240 lines 10-25; 241 lines 1-19; 242 lines 1-25; 243 lines 9-16 excerpts attached as Exhibit "H."

      58.    Deputy Boucher was right beside Officer Marshall after Deputy Boucher crossed the street during the final stages of the deliberate action plan.  Further, as three (3) other officers, Detective Merino, Officer Hudson, and Officer Marshall, had decided independently to use lethal force to stop BW, Deputy Boucher also made the same decision:

**Dispute.**  The only shot taken was by Defendant Boucher and none of the other officers in fact ever pulled the trigger on their weapon even though after the fact they testify as having made a decision that was not carried out.  Significantly, in Officer Merino's deposition, he testified that he heard a gun-shot that he believe was from BW, he swung his rifle up to shoot, realized he had not dialed down his scope, swung it down, reached to his leg and pulled his side-arm up and aimed to shoot at BW when he heard the rifle shot ring out.  His testimony was that this all happened in moments.  However, the pole camera footage taken of the events leading up to the shooting of BW show a different event altogether.  In the video at time stamps 1:19:28 to 1:21:09, a time greater than one minute and thirty seconds pass from the time Officer Merino claimed he was going to shoot BW to the time Defendant Boucher actually did.  *See* Viper Video CD attached as Exhibit "I" hereto from time stamp 1:19:28 to 1:21:09 consecutively.  (Entirety of produced video is included in the exhibit as camera feed 2) and compare to Depo. of B. Merino at pgs. 97 lines 17-25, 98 lines 1-25, 130 lines 15-25; 131 lines 1-18; 187 lines 1-16; 201 lines 1-12.

**F.**     **Events After BW Was Shot**

60.     When Detective Merino approached BW with a couple other officers, Detective Merino "could still see the gun was still in his hand."

**Dispute.** Officer Hudson testified that when Merino approached BW and stepped on his hand, there was no gun in his hand. *See* Depo. of Justin Hudson at pgs. 108 lines 15-25; 109 lines 1-15. Officer Marshall testified that he doesn't have any recollection of seeing BW's gun in his hand or anywhere else after he was shot. *See* Depo. of Dustin Marshall pgs. 211 lines 20-25; 212 1-5.

64.     In addition to Detective Merino and Sid Cluff hearing a shot fired by BW before Deputy Boucher shot, Officer Eldard, a marksman deployed on the roof across the street during the deliberate action plan, also testified that he saw a muzzle flash from BW's gun a few seconds before BW fell. A bullet from BW's gun was later recovered from the passenger side headlight of the truck Detective Merino and other officers were taking cover behind.

**Dispute.** The statements by Mr. Cluff are hearsay, inadmissible and not authenticated. The evidence regarding ballistics has yet to be shared with Plaintiffs although requests have been previously made and are part of the Rule 56(f) Motion that Plaintiffs are also filing. Moreover, Officer Dustin Marshall, standing immediately to the east of Defendant Boucher testified that he did not hear a shot fired from BW's gun nor did he see a muzzle flash from his gun. Detective Olsen testified that he did not see or hear a gunshot from BW's gun while Olsen was tasing BW. Todd Barton testified that BW did not have a gun in his hand when BW was shot. Officer Marshall also testified that he did not hear the sound of a hand gun being fired before Defendant Boucher shot and killed BW. *See* Depo. of D. Marshall at pgs. 189 lines 16-25; 239 2-7; 240

lines 10-25; 241 lines 1-19; 242 lines 1-25; 243 lines 9-16, Depo. of B. Olsen at pgs. 48 lines 1-8; 83 lines 24-25, 84 lines 1-6; 110 lines 4-13 attached as Exhibit "J."; Depo. of T. Barton at pgs. 86 lines 13-25; 87 lines 1-25

## PLAINTIFFS' STATEMENT OF FACTS

As the moving party, Defendant has the burden of demonstrating that they are entitled to summary judgment and the court must consider the evidence presented in the light most favorable to the non-moving (Plaintiffs) party. *Bryner v. Salt Lake County,* 2009 WL 2058717 (D. Utah). Given these parameters, the Court must assume that the facts are:

1. At approximately 9:30 a.m. on September 22, 2008 BW fired a .38 caliber hand gun into utility trailer filled with garbage and not at any person. *See* Aff. of J. Wood at ¶ 7.

2. While Jerry Wood was observing his son BW, he never saw BW point his gun at any officer or other person. *See* Aff. of J. Wood at ¶¶ 8 and 9.

3. An officer told Todd Barton, a friend of BW who was on scene throughout the day on September 22, 2008, that they were encouraged by his interactions with BW. *See* Depo. of Todd Barton at pgs. 54 lines 2-10 and 18-25; 55 lines 1-13.

4. An officer told Todd Barton the BW had fired a shot into a garbage can. *See* Depo. of T. Barton at pg. 55 lines 21-25.

5. During the standoff, BW informed officers that they could get sodas from inside his house. *See* Depo. of T. Barton at pgs. 39 Lines 23-25 and lines 1-7 and 55 lines 4-13.

6. At any time prior to the second deliberate action attack on BW, he never pointed a gun at a police officer during the stand-off. *See* Depo. of D. Marshall at pg. 253 lines

6-12; Depo. of Brett Olsen at 111 lines 9-15; Depo. of J. Boucher at pg. 146 lines 16-18.

7. Incident Commander Chief Wayne Hansen and other officers on the scene told Plaintiffs' family that they would not take aggressive action against BW and would wait him out.  *See* Exhibit "A" Aff. of J. Wood at ¶ 10.

8. Nevertheless, BW was violently attacked for the first time at approximately 2:30 p.m. with the use of barrier penetrators, CS gas canisters and OS gas canisters until he exited his truck.  *See* depositions of Marshall, Merino, Hudson, and Boucher.

9. Prior to the second deliberate attack on BW, Plaintiffs were told that BW was exhausted, nodding off and they were going to wait for him to fall asleep before attempting to take him into custody.  *See* Exhibit "A" Aff. of J. Wood at ¶¶10 and 12.

10. Todd Barton, Paul Waite and Faith Wood went to the Davis County School Administration building at approximately 9:00 p.m. on September 22, 2008 to get a better view of the scene.  *See* Depo. of T. Barton at pgs. 60 lines 8-25; 62 lines 13-23; 65 lines 2-25; 66 lines 1-6.

11. Todd Barton observed BW from the Davis County School Administration building and described the view as the area being lit up like a Christmas tree.  *See* Depo. of T. Barton at pgs 65 lines 20-25; 66 lines 1-6.

12. During the several minutes Todd Barton observed BW before the final deliberate attack on BW, he testified that BW was looking tired and peaceful.  *See* Depo. of T. Barton at pgs. 71 lines 8-21; 76 lines 14-25; 77 lines 1-15.

13. Prior to the final deliberate attack, Todd Barton observed BW with a gun in his hand moving it from his right to left hand.  *See* Depo. of T. Barton pgs. 77 lines 16-25; 79 lines 3-9.

14. During the final deliberate attack on BW, he was tased from two directions and from two different tasers.  *See* Depo. of T. Barton at pgs. 83 lines 20-25; 84 lines 1-5, 22-25; 85 lines 1-25; 86 lines 1-7; 90 lines 8-23; 91 lines 1-4.

15. BW was tased in the left hip and upper back.  *See* Depo. T. Grey at pgs. 31, 32, 33, 35, 36, 37, 47, 48, 58, attached hereto as Exhibit "K" and further identified in Medical Examiner photos attached as Exhibit "L" and labeled P00109, P00110, P00144, and P00145 and Medical Examiner Report attached hereto as Exhibit "N."

16. Officer Olsen testified he tased BW in the upper back and the shirt he was wearing at the time he was killed had 2 taser prongs stuck in the upper back area consistent with his testimony.  *See*  Depo. of B. Olsen at pgs. 101 lines 19-25; 102 lines 1-25; 140 lines 17-25; 141 lines 1-6; 142 lines 1-16 and Medical Examiner photos Attached as Exhibit "L" numbered P00068, P00069 and P00073.

17. During the final deliberate attack on BW, he was struck and injured by dozens of less-lethal ammunition including pepper balls, rubber bullets, and foam batons and was tased by at least two different tasers, with Olsen's taser being activated for 43 seconds with a total of four non-consecutive seconds where the taser was not actively cycling. *See* Depo. of T. Grey, M.E. at pgs. 31 lines 11-25; 32 lines 1-1033 lines 15-22; 35 lines 7-21; 36 lines 2-25; 37 lines 1-11; 47 lines 10-23; 48 lines 20-25; 49 lines 1-14; 53 lines 10-17; 58 lines 14-20; 87 lines 1-8 and 19-25;  Depo. of B. Olsen at pgs. 101

lines 19-25; 102 lines 1-25, 51 lines 14-23; Depo. of T. Barton at pgs. 83 lines 20-25;

84 lines 1-5, 22-25; 85 lines 1-25; 86 lines 1-7; 90 8-23; 91 lines 1-4; 141 lines 16-25;

142 lines 1-7; Taser Log  Farm00454-Farm00455 attached as Exhibit "M"; and

Medical Examiner photos P00140, P00111, P00112, P00113.

18. BW pleaded to stop being tased.  *See* Depo. of B. Olsen at pgs. 143 lines 24-25, 144

lines 1-2.

19. While being tased, BW was on his knees with his hands up and not holding a gun.

*See* Depo. of T. Barton at pg. 86 lines 8-21.

20. When BW was killed by Defendant Boucher, BW did not have a gun in his hand.  *See*

Depo. of T. Barton at pg. 86 lines 13-25; 87 lines 1-25.

21. BW did not fire his handgun prior to being killed by Defendant Boucher.  *See* Depo.

of T. Barton at pgs. 88 lines 1-20, 24-25; 89 lines 1-4; Depo of D. Marshall at pgs.

189 lines 16-25; 239 lines 2-7; 240 lines 10-25; 241 lines 1-19; 242 lines 1-25; 243

lines 9-16.

22. Defendant Boucher did not have a working radio at the time the deliberate attack on

BW began and at the time BW was shot and killed even though he knew how

important it is to keep radio communication available in such actions.  *See* Depo. of J.

Boucher at pgs. 95 lines 9-11, 97 lines 1-25; 98 lines 1-25.

23. Defendant Boucher was not wearing the glasses he needed for his astigmatism and to

assist him in seeing at night when he shot and killed BW.  *See*  Depo. of J. Boucher

at pgs. 102 lines 20-25; 103 lines 1-25.

24. Defendant Boucher imagined seeing BW shooting an officer and the officer falling down just prior to his taking the lethal shot at BW; this did not happen.  *See*  Depo. of J. Boucher at pgs 137 lines 22-25, 138 lines 1-4 and transcript of Joshua Boucher's recorded statement taken on September 24, 2008 excerpts attached hereto as Exhibit "O" at pg. 60 lines 17-19.

25. When Defendant Boucher killed BW  his mind had been racing since the deliberate action countdown began.  *See* Depo. of J. Boucher at 138 lines 5-12.

26. When Defendant Boucher shot BW, he was looking straight at him at essentially the same level.  *See* Depo. Joshua Boucher at pgs. 112 lines 1-25; 114 lines 6-25; 115 lines 1-10; 191 Lines 15 to 23.

27.   The trajectory of the bullet was essentially in a straight line from BW's left cheek just below his cheek bone and exited out the right upper back.  *See* Depo. of Todd Grey, M.E. at pgs. 39 lines 2-3 and 19-21; 41 lines 3-6; 43 lines 1-9 and 20-24; 51 lines 4-13; 53 lines 7-9; 56 lines 3-25; 57 line 1; 62 lines 1-25; 63 lines 8-25; 64 lines 1-13; 69  lines 23-25; 70 lines 1-25; 71 lines 1-25; 72 lines 1-24; 73 lines 1-14 and 22-25; 74 lines 1-14; 93 12-25; 94 lines 1-7; 97 lines 12-25; 98 lines 1-25; 99 lines 1-2; and Medical Examiner Photos at P00047, P00048, P00096, P00097, P00098, P00124, P00125, P00126, P00138, P00139, P00157, P00158 and P00161 (location of entrance wound, exit wound and bullet trajectory).

28. Based on Defendant Boucher's own testimony, Dr. Todd Grey concluded that the trajectory of the bullets path through BW's left cheek and out his upper back could not have happened with BW directly facing Defendant Boucher with each person at

approximately the same level.  *See* Depo. of J. Boucher at pgs. 112 lines 1-25; 114
lines 6-25; 115 lines 1-10; 191 lines 15-23, Depo. of T. Grey at pgs. pgs. 39 lines 2-3
and 19-21; 41 lines 3-6; 43 lines 1-9 and 20-24; 51 lines 4-13; 53 lines 7-9; 56 lines
3-25; 57 line 1; 62 lines 1-25; 63 lines 8-25; 64 lines 1-13; 69  lines 23-25; 70 lines 1-
25; 71 lines 1-25; 72 lines 1-24; 73 lines 1-14 and 22-25; 74 lines 1-14; 93 12-25; 94
lines 1-7; 97 lines 12-25; 98 lines 1-25; 99 lines 1-2; and Medical Examiner Photos at
P00047, P00048, P00096, P00097, P00098, P00124, P00125, P00126, P00138,
P00139, P00157, P00158 and P00161 (location of entrance wound, exit wound and
bullet trajectory).

29. When Officer Merino approached BW after he was killed, he stepped on his arm and
no gun was in his hand.  *See* Depo. of J. Hudson at pgs. 108 lines 15-25; 109 lines 1-
15; Depo. of D. Marshall pgs. 211 lines 20-25; 212 lines 1-5.

30. Becky and Jerry Wood were on scene all day and witnessed both violent actions taken
against BW, the last one resulting in his death.  The events of the day, after being
promised by Chief Hansen and others that they would not take aggressive action
against BW caused each significant emotional distress.  *See* Aff. of Jerry Wood at ¶¶
10, 12, 13, 14, 18 and 19.

31. The misleading statements made regarding BW's cause of death; to wit; that BW had
shot himself in the chest, caused the Plaintiffs substantial emotional distress.  *See* Aff.
of Jerry Wood at ¶¶ 14, 15, 17 and 20.

32. Jerry Wood was told by an FBI Officer present on scene that after BW had been shot,
that they (the police) had "messed up."  *See*  Aff. of Jerry Wood at ¶ 16.

**ARGUMENT**

I.   **BECAUSE THERE ARE GENUINE ISSUES OF MATERIAL FACTS IN DISPUTE, DEFENDANT JOSHUA BOUCHER IS NOT ENTITLED TO A GRANT OF QUALIFIED IMMUNITY ON PLAINTIFFS' EXCESSIVE FORCE CLAIMS.**

Officer Joshua Boucher claims he is entitled to the entry of summary judgment, in part, on the grounds of qualified immunity.  A claim for qualified immunity should be denied if the plaintiffs show that defendant violated a constitutional or statutory right and that this right was clearly established at the time of the defendant's conduct.  *V-1 Oil Co. v. Wyoming* 902 F. 2d 1482 (10th Cir. 1990); *Saucier v.* Katz, 533 U.S. 194, 201 (2001); Bryner *v. Salt Lake County,* 2009 WL 2058717 (D. Utah) (mem.).  If the facts taken in the light most favorable to Plaintiffs demonstrates the violation of a clearly established right, then qualified immunity is not available. *Holland v. Harrington*, 268 F. 3d 1179, 1185-1186 (10th Cir. 2001); *See also Olsen v. Layton Hills Mall*, 312 F. 3d 1304, 1312 (10th Cir. 2002) (applying this standard in Utah).

"When the record shows an unresolved dispute of historical fact relevant to this immunity analysis, a motion for summary judgment based on qualified immunity should be 'properly denied.'"  *Olsen,* 312 F.3d  at 1312 (citing *Salmon v. Schwarz,* 948 F. 23 1131, 1136 (10th Cir. 1991); *See also, Saucier,* 533 U.S. at 216 ("Of course, if an excessive force claim turns on which of two conflicting stories best captures what happened. . . Graham will not permit summary judgment in favor of the defendant official. . .  In such a case, the Court's two step procedure is altogether inutile."; *Quezada v. County of Bernalillo,* 944 F.2d 710, 715 (10th Cir. 1991) ("[W]hether the police used excessive force in a §1983 case has always been seen as a factual inquiry best answered by the fact finder.") citing *Street v. Parham,* 929 F.2d 537, 541 n.2 (10th

Cir. 1991)(overruled on other grounds by *Saucier*).  Because there are disputed material facts

regarding the objective reasonableness of Defendant Boucher's use of deadly force in this case

summary judgment is inappropriate.  *See Maestas v. Lugan,*  351 F. 3d 1001, 1009 (10th Cir.

2003)(affirming district court's decision to send qualified immunity analysis to jury because

disputed issues of material fact on objective reasonableness of regional director's actions).

Here, Plaintiffs have raised genuine issues of material fact that, if proven, demonstrate

that Defendant Boucher violated BW's constitutional right to be free from unlawful seizure when

he used deadly force against BW who was unarmed and being detained by the effects of  two

tasers being deployed on him for at least 43 seconds.  *See*  Taser Logs attached as Exhibit "M"

and Depositions of T. Barton and B. Olsen attached as Exhibit "E" and "J" respectively.

Moreover, the egregious and unconscionable nature of Defendant Boucher's actions demonstrate

that BW's rights were clearly established as of September 22, 2008, and as such, qualified

immunity does not attach and defendant's motion must be denied.

> **II.    PLAINTIFFS' HAVE RAISED MULTIPLE ISSUES OF DISPUTED
> MATERIAL FACTS SUFFICIENT TO DEMONSTRATE THAT
> DEFENDANT BOUCHER USED EXCESSIVE FORCE AGAINST
> BW.**

Whether a claim for excessive force is actionable is analyzed the United States

Constitution's Fourth Amendment "objective reasonableness standard."  *Cordovo v. Aragon,*

569 F.3d 1183, 2009 WL 1707919, at *3 (10th Cir. 2009); *Marquez v. City of Albuquerque,* 399

F. 3d 1216, 1220 (10th cir. 2005) (quoting *Graham v. Connor*, 490 U.S. 386, 388, 109 S.Ct.

1865, 104 L.Ed.2d 443 (1989); Weigel *v. Broad,* 544 F.3d 1143, 1158 (10th Cir. 2008); *Bryner v.*

*Salt Lake County,* 2009 WL 2058717 (D. Utah).   In *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)

the Supreme Court held it unconstitutional to use deadly force unless the officer has probable

cause to believe that the suspect poses a significant threat of death of serious physical injury to the officers or others.  The Supreme Court further clarified these rights under *Graham v. Connor,* 490 U.S., 386, 396 (1989), wherein the Court held that the right to be free from excessive force is governed by the Fourth Amendment's reasonableness requirements **and** requires "careful attention to the facts and circumstances of each particular case. . ."  (Citing *Garner,* 471 U.S. at 8-9)("the question is whether the 'totality of the circumstances justifies a particular sort of seizure'")).  The Supreme Court has made it clear that "[t]he 'reasonableness' inquiry in an excessive force case is an objective one:  the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id.* at 397 (quoting *Scott v. United States,* 436 U.S. 128, 137-139 (1978).

Whether an officer's conduct is "objectively reasonable" under the Court's standard is highly fact dependent and should be considered on a case-by-case basis.  *Dixon v. Richer,* 922 F.2d 1456, 1462 (10th Cir. 1991).  "Because the reasonableness inquiry overlaps with the qualified immunity analysis, "a qualified immunity defense [is] of less value when raised in the defense of an excessive force claim."  *Olsen*, 312 F.3d at 1314 (citing *Quezada,* 944 F. 2d at 718).  The court should also consider Defendant Boucher's actions prior to him using lethal force against BW.  "Whether [the officers'] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force" is a relevant inquiry.  *Allen v. Muskogee,* 119 F.3d 837, 840 (10th Cir. 1997) "An officer's conduct before the suspect threatens force is therefore relevant provided it is 'immediately connected' to the seizure and the threat of force."  *Id.*

In this case, the facts do not show that Defendant Boucher acted with objective reasonableness.  Taking the facts in the light most favorable to plaintiff, when evaluating the objective reasonableness of Defendant Boucher's action, the court must consider the following facts as true:

(1) Boucher did not have an operating radio, was not wearing his glasses he needed at night and his mind was racing because of the plan his superior officers put into effect.  *See* Deposition of Joshua Boucher at pgs. 95 lines 9-11, 97, 98, 102 lines 20-25, 103, 138 lines 5-12 attached as Exhibit "G";

(2) In the seconds prior to shooting BW, Defendant Boucher **imagined** BW had shot an officer and the officer was falling to the ground even though this did not happen.  *See* Deposition of Joshua Boucher at pgs. 137 lines 22-25 and 138 lines 1-4 and Recorded Statement of Joshua Boucher at pg. 60 lines 17-19 attached as Exhibit "O";

(3) Defendant Boucher volunteered to serve with Officers Merino and Hudson as snipers and there is no indication he was considered by command to be part of their team.  *See* Deposition of Break Merino pg. 120 lines 8-19 attached as Exhibit "C" and Assignment Board attached as Exhibit "D";

(4)  At no time during the stand-off, and prior to the final deliberate attack, had BW pointed his weapon at any officer or person other than himself.  *See* Affidavit of Jerry Wood at ¶ 2 attached as Exhibit "A", Deposition of Dustin Marshall at pg. 253 lines 6-12, Deposition of Bret Olsen at pg. 111 lines 9-15; Deposition of Joshua Boucher at pg. 146 lines 16-18;

(5)  BW was being tased by two different tasers at the time he was shot and killed by Defendant Boucher.  At least one tasing lasted for a total of 47 seconds with only 4, non-

consecutive seconds where the taser was not activated.  *See* Depo. of T. Grey, M.E. at pgs. 31 lines 11-25; 32 lines 1-1033 lines 15-22; 35 lines 7-21; 36 lines 2-25; 37 lines 1-11; 47 lines 10-23; 48 lines 20-25; 49 lines 1-14; 53 lines 10-17; 58 lines 14-20; 87 lines 1-8 and 19-25;  Depo. of B. Olsen at pgs. 101 lines 19-25; 102 lines 1-25, 51 lines 14-23; Depo. of T. Barton at pgs. 83 lines 20-25; 84 lines 1-5, 22-25; 85 lines 1-25; 86 lines 1-7; 90 8-23; 91 1-4; 141 lines 16-25; 142 lines 1-7; Taser Log  Farm00454-Farm00455 attached as Exhibit "M"; and Medical Examiner photos P00140, P00111, P00112, P00113.

(6) BW was pleading not to be tased just prior to being shot by Defendant Boucher.  *See* Deposition of Bret Olsen at pgs. 124 lines 24-25 and 144 lines 1-2 attached as Exhibit "J";

(7) Todd Barton observed the final deliberate attack on BW and testified that in the moments before BW was shot by Defendant Boucher, that BW was down, being tased by two different tasers, and his hands were held up and empty.  *See* Deposition of Todd Barton at pgs. 86 lines 8-25 and 87 attached as Exhibit "E" and Deposition of Todd Grey, M.E. at pgs. 31, 32, 33, 35, 36, 37, 47, 48, 58, attached as Exhibit "K";

(8) BW had not fired his .45 caliber handgun prior to Defendant Boucher killing BW. *See* Deposition of Todd Barton at pgs. 88 lines 1-20, 24-25; 89 lines 1-4; Deposition of Dustin Marshall at pgs. 189 lines 16-25; 239 lines 2-7; 240 lines 10-25; 241 line 1-19; 242 lines 1-25; 243 lines 9-16 attached as Exhibit "H";

(9)  Only Defendant Boucher shot at BW even though officers Merino, Hudson and Marshall testified they had decided to shoot, and even though Officer Merino's testimony about his decision to shoot BW is belied by the Viper Camera Video of the moments leading up to and the moment BW was shot and killed by Defendant Boucher.  *See* Viper Video CD attached as

Exhibit "I" hereto from time stamp 1:19:28 to 1:21:09 consecutively.  (Entirety of produced

video is included in the exhibit as camera feed 2) and compare to Deposition of Break Merino at

pgs. 97 lines 17-25, 98 lines 1-25, 130 lines 15-25; 131 lines 1-18; 187 lines 1-16; 201 lines 1-

12;

(10)  When BW was found after being shot by Defendant Boucher, no gun was in his

hand and there is a question as to whether there was a gun anywhere near his lifeless body.  *See*

Deposition of Justin Hudson at pgs. 108 lines 15-25 and 109 lines 1-15; Deposition of Dustin

Marshall at pgs. 211 lines 20-25 and 212 1-5; and

(11) The trajectory of the bullet as it passed through BW's left cheek and through his

upper right back could not have physically happened when considering Defendant Boucher's

own testimony that he was facing BW and was at the same relative height as BW at the moment

he took the fatal shot.  *See* Deposition of Joshua Boucher at pgs. 112 lines 1-25; 114 lines 6-25;

115 lines 1-10; 191 lines 15-23, Deposition of Todd Grey at pgs. 39 lines 2-3 and 19-21; 41 lines

3-6; 43 lines 1-9 and 20-24; 51 lines 4-13; 53 lines 7-9; 56 lines 3-25; 57 line 1; 62 lines 1-25; 63

lines 8-25; 64 lines 1-13; 69  lines 23-25; 70 lines 1-25; 71 lines 1-25; 72 lines 1-24; 73 lines 1-

14 and 22-25; 74 lines 1-14; 93 12-25; 94 lines 1-7; 97 lines 12-25; 98 lines 1-25; 99 lines 1-2;

and Medical Examiner Photos at P00047, P00048, P00096, P00097, P00098, P00124, P00125,

P00126, P00138, P00139, P00157, P00158 and P00161.

Based on *Dixon*, *Garner, Scott,  Graham*, *Allen* and their progeny, all of these facts must

be taken into account in determining a grant of summary judgment based on Qualified Immunity.

Each of these facts cast a cloud on and is material to the question of whether Defendant

Boucher's use of lethal force against BW was objectively reasonable both at the time it was used and during the events leading to the use of lethal force.

In the events leading up to the use of deadly force we have Defendant Boucher who volunteers for a sniper position even though there is no testimony that he was ever assigned to a team. Defendant Boucher is not properly equipped, by his own admission, with a working radio. Defendant Boucher's eyes are fatigued so he is not wearing the glasses he uses at night because of astigmatism in his eyes, even though it is definitely dark out. Defendant Boucher's mind was racing at the count-down for the deliberate attack on BW, but not because of any new aggressive action by BW. When Defendant Boucher gets in position to shoot, he imagines BW has shot an officer and the officer is falling, an event that never happened, and which leads him to his decision to use lethal force. Simply looking at the events prior to lethal force being used against BW the court could easily consider that Defendant Boucher failed to act in an objectively reasonably manner. However, the lack of objective reasonableness in using lethal force is more evident when looking at the actually shooting.

Defendant Boucher shoots BW while he is being tased from two sources. One taser is on for 43 seconds with only 4 non-consecutive seconds where the taser was not active. Meanwhile, BW is on his knees pleading for the tasing to stop. BW does not have a gun in his hands. His hands are up. Yet, Defendant Boucher, while imagining non-existent events takes the fatal shot. A shot that based on the physical evidence of bullet trajectory could not have happened if Defendant Boucher's testimony is believed. Nothing about Defendant Boucher's use of lethal force is "objectively reasonable" when viewing Plaintiffs facts in the light most favorable to

them.  Defendant Boucher's use of lethal force against an unarmed BW who is being tased

cannot be considered an objectively reasonable use of deadly force.

### III.   BW'S RIGHT TO BE FREE FROM UNREASONABLE USE OF DEADLY FORCE WAS CLEARLY ESTABLISHED PRIOR TO SEPTEMBER 22, 2008.

The second prong of the qualified immunity analysis is whether BW's right to be free

from unreasonable use of force was clearly established at the time.  Since the Supreme Court's

pivotal decision in *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court and the 10th

Circuit have defined this standard as an analysis of whether officials would be on "fair notice" of

the right.  "The relevant, dispositive inquiry in determining whether a right is clearly established

is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation

he confronted."  *Casey v. City of Federal Heights,* 509 F.3d 1278, 1284 (10th Cir. 2007) (quoting

*Saucier v. Katz,* 533 U.S. 194, 207 (2001)).  "[B]ecause excessive force jurisprudence requires

an all-things-considered inquiry 'with careful attention to the facts and circumstances of each

particular case,' there will almost never be a previously published opinion involving exactly the

same circumstances."  We cannot find qualified immunity wherever we have a new fact pattern.

*Id*. (quoting *Graham,* 490 U.S. at 396).  Instead of conducting "'a scavenger hunt for prior cases

with precisely the same facts,'" this Court should consider "'whether the law put officials on fair

notice that the described conduct was unconstitutional.'"  *Id*. (citation omitted).

Officers may only use deadly force when there is "probably cause to believe that the

suspect poses a threat of serious physical harm, either to the officer or to others.  *Tennessee v.*

*Garner,* 471 U.S. at 11; *see also Carr v. Castle,* 337 F.3d 1221, 1227 (10th Cir. 2003) ("There is

no question that . . . the law concerning when the use of deadly force is appropriate was clearly

established."); *Mick v. Brewer,* 76 F.3d 1127, 1136 (10th Cir. 1996) (holding that the law

governing excessive force cases was clearly established prior to June 18, 1992).

  BW's right was clearly established on September 22, 2008 to be free of the use of deadly

force.  First, Defendant Boucher concedes that the law governing deadly force "is clearly

established because the Tenth Circuit Court of Appeals has dealt directly with the use of deadly

force and upheld defendant officers being granted summary judgment dismissal on qualified

immunity grounds." *See* Defendants Memorandum in Support of Defendant Joshua Boucher's

Motion for Summary Judgment at pg. 52.  Second, Defendant Boucher's actions of using lethal

force against BW when he was down, being tased and without a weapon in his hand is so

egregious that no specific reference to a factually similar case is required.  Moreover, Defendant

Boucher's citation to *Christianson v. City of Tulsa*, 332 F.3d 1270 (10th Cir. 2003) is misplaced

and factually dissimilar.  In *Christianson*, although there may be similarities in that a stand-off

had occurred, the police did not exercise the use of deadly force in that case, but fired a less

lethal object toward Mr. Christiansen who thereafter ended his own life.  In this case, the fact is

undisputed that BW was killed by Defendant Boucher.  As such, Defendant's citation to

*Christianson* neither supports nor goes against the fact that the 10th Circuit had clearly

established law governing excessive force cases many years prior to September 22, 2008.  Based

on the foregoing, Plaintiffs have met their burden of showing that Defendant Boucher violated

BW's Constitutional Right to be free from the use of deadly force and that such right was clearly

established prior to September 22, 2008 and as such, Defendant Boucher is not entitled to

qualified immunity.

### IV.    PLAINTIFFS' STATE CONSTITUTIONAL CLAIMS ARE VIABLE.

Plaintiffs brought claims under the Utah Constitution, article I, §§ 7, 9, 14 and 15. Section 7 is the state due process clause. Section 9 prohibits, "Persons arrested or imprisoned shall not be treated with unnecessary rigor." Section 14 is the equivalent of the federal Fourth Amendment. Section 15 appears to have been pled in error and is not a claim that is being pursued by Plaintiffs.

Defendants request for a grant of summary judgment on Plaintiffs' Utah Constitutional Claims appears to be based on his claim that he is entitled to summary judgment for qualified immunity and that because he doesn't believe he used excessive force that Plaintiffs cannot prove a "flagrant" violation of the Utah Constitution per *Jensen, ex. Rel. Jensen v. Cunningham,* 2011 UT 17, ¶¶ 57-58, 250 P.3d 465. Defendant Boucher's argument is flawed in that Plaintiffs have raised sufficient disputed material facts that show Defendant Boucher unconstitutionally used lethal force. Those same disputed facts would go to prove Plaintiffs' pendant Utah State Constitution claims. The fact that Defendant Boucher claims he was justified in using lethal force does not somehow convert his unlawful killing of BW into something that is less than "flagrant" under Utah law. It is bewildering to think that killing an unarmed man who is being tased could be something less than a flagrant violation of the Utah Constitution.

Further, Defendant Boucher's claim that the Utah Constitution is not self-executing is inaccurate. "[Sections] 1, 7 and 14 of Article I are self-executing. . . " *P.J. ex rel Jensen v. Utah,* No. 2:05CV00739 PGC, 2006 WL 1702585 (D. Utah June 16, 2006) (unpub). Plaintiffs have *infra* shown (and Defendant conceded) that clearly established law with respect to the use of deadly force was established prior to September 22, 2008. That coupled with the flagrant

nature of killing an unarmed BW who was being tased precludes Defendant Boucher from

summary judgment on Plaintiffs' Utah Constitutional claims.

### V.   PLAINTIFFS CLAIMS FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ARE VIABLE.

Defendant Boucher contends he is not responsible to Plaintiffs for intentional infliction of

emotional distress as a matter of law because his actions were against BW, not Plaintiffs.

Although Defendant is generally correct that the intentional conduct must be toward plaintiff,

there are exceptions to this presence requirement.  "[C]onduct which occurs outside the presence

of a plaintiff may not contribute to a claim of intentional infliction of emotional distress except

under particularly compelling circumstances." *Hatch v. Davis, 2006 UT 44, P 26, 147 P.3d 383*.

> In considering whether conduct triggers the exception [to the "presence" rule], a finder of fact may consider (1) the relationship of the target of the conduct to the plaintiff, (2) the relationship between the person committing the conduct and the plaintiff, and (3) the egregiousness of the conduct. Finally, (4) a plaintiff must establish that the conduct was undertaken, in whole or in part, with the intention of inflicting injury to the absent plaintiff.

*Id*. P 27.  Here, although Plaintiffs are not the persons killed by Defendant Boucher, each

plaintiff had a special relationship with the target, BW; to wit; spouse and son.  Defendant

Boucher's position as an officer of the law, someone sworn to uphold the Constitution, is the

type of relationship and Plaintiffs each expected that Defendant Boucher would uphold the law.

Third, the egregious nature of conduct wherein Defendant Boucher shot and killed BW while he

was unarmed, on his knees and being tased is just the type of conduct that would support an

imposition of intentional infliction of emotional distress on Plaintiffs.  The final prong of *Hatch*

is met by Plaintiffs in that Defendant Boucher intentionally violated clearly established law by

using lethal force against BW and wherein he also knew that BW had family who would be emotionally devastated by his conduct which resulted in BW's death.

With respect to whether Defendant Boucher's deliberate violation of BW's constitutional right to be free from the use of lethal force without cause in killing an unarmed BW who was on his knees being tased would lead a reasonable person to know that his actions would cause emotional distress and that those actions would "be considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality" is patent. *Bennett v. Jones, Waldo, Holbrook & McDonough,* 2003 UT9, ¶ 58, 70 P.3d 17. (quoting *Franco v. Church of Jesus Christ of Latter-day Saints,* 2001 UT 25, ¶25, 21 P.3d 198).  Plaintiffs agree that the court could find Defendant Boucher's conduct outrageous.

## CONCLUSION

Defendant Joshua Boucher violated BW's constitutional rights to be free from the unlawful use of lethal force.  Defendant Boucher was ill equipped for the job he placed himself in the middle of and allowed his mind to fabricate events to support his use of lethal force against BW.  BW was unarmed, on his knees and being tased when he was shot and killed.

The testimony of Todd Barton, Todd Grey and the physical evidence that has been presented in the exhibits hereto, raise genuine issues of material fact that Defendant Boucher acted unreasonably in the use of lethal force on BW.  By analyzing *Graham* and its progeny regarding excessive force claims, there was a clearly established right to such protection at the time BW was killed.  Plaintiffs have raised a material issue of fact which precludes the imposition of summary judgment for Defendant Boucher's claim of qualified immunity and allows Plaintiffs to present their claims against him to a jury.

Plaintiffs have asserted viable Utah Constitutional law and intentional infliction of emotional distress claims and have raised genuine issues of material fact to support such claims and allow them to present these claims to a jury.

DATED this 20th day of January, 2012.

WRONA LAW FIRM, P.C.

/s/ S. Brook Millard_____                    Dated_____01/20/12_____
S. BROOK MILLARD

## CERTIFICIATE OF SERVICE

I HEREBY certify that I caused a true and correct copy of the foregoing MEMORANDUM IN OPPOSITION TO DEFENANT JOSHUA BOUCHER'S MOTION FOR SUMMARY JUDGMENT to be sent via ECF on this __20th__ day of January, 2012 to the following:

Allan L. Larson
Heather S. White
SNOW, CHRISTENSEN &
MARTINEAU
10 Exchange Place, 11th Floor
P.O. Box 45000
Salt Lake City, UT 84145
*Attorneys for Farmington City*

Peter Stirba
Nathan A. Crane
Julia D. Kyte
STIRBA & ASSOCIATES
215 South State Street, Suite 750
P.O. Box 810
Salt Lake City, Utah 84110-0810
*Attorneys for Davis County and Joshua Boucher*

J. Wesley Robinson
SALT LAKE CITY CORPORATION
PO Box 145478
451 S. State Street, Suite 505
Salt Lake City, UT 84114-5478
*Attorneys for Salt Lake City*

_/s/  S. Brook Millard_____

32

## INDEX OF EXHIBITS TO PLAINTIFFS' MEMORANDUM
## IN OPPOSITION TO DEFENDANT JOSHUA BOUCHER'S
## MOTION FOR SUMMARY JUDGMENT

**EXHIBIT NO.**                              **DESCRIPTION**

A            Affidavit of Plaintiff Jerry Wood

B            Deposition Transcript of Wayne Hansen (Cover Page and page 9-11)

C            Deposition Transcript of Break Merino (Cover Page, pp. 87, 92-98, 120, 130-131, 163-164, 187-188, 190-192, 200-201, 222, 240-241, 264-267, 283)

D            Assignment Board Photo

E            Deposition Transcript of Todd Richard Barton (Cover Page, pp. 39-40, 54-55, 60, 62, 65-66, 68-72, 76-79, 83-95, 97, 100-104, 132, 142-145, 150-153, 156-157, 159-160,  162-165, 227-229, 240, 242, 247-254)

F            Deposition Transcript of Justin Hudson (Cover Page, pp. 23, 88, 90, 95-96, 104-109)

G            Deposition Transcript of Joshua D. Boucher (Cover Page, pp. 94-106,  111-115, 121-124, 135-139, 145-146, 153-156, 163-169, 174-181, 191)

H            Deposition Transcript of Dustin Marshall (Cover Page, pp. 187-190, 201-203, 205-212, 221-223, 226-228, 237-244, 248, 253, 271)

I            Viper Video CD

J            Deposition Transcript of Brett Olsen (Cover Page, pp. 47-48, 58-59, 82-84, 101-102, 109-111, 116-119, 135-138, 140-144, 146-147, 152-154)

K            Deposition Transcript of Todd C. Grey, M.D. (Cover Page, pp. 31-33, 35-37. 39, 41-43, 45, 47-49, 51, 53, 56-58, 62-65, 69-75. 80-81, 86-87, 91-94, 97-100)

L            Medical Examiner Photo Nos. P00109-P00110, P00144-P00145, P00069, P00068, P00073, P00111-P00113, P00140, P00047-P00048, P00096-P00098, P00124-P00126, P00138-P00139, P00158, P00157, P00161

M            Taser Log – FARM00454-FARM00455

N    Medical Examiner Report

O    Transcript of Joshua Boucher's Recorded Statement Taken September 24, 2008, pp. 1, 60-62