IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **ELIZABETH WOOD, individually and as the personal representative of the Estate of BRIAN WOOD; JERRY WOOD; and BECKY WOOD,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**FARMINGTON CITY, a Utah municipal corporation; DAVIS COUNTY, a political subdivision of the State of Utah; SALT LAKE CITY, a Utah municipal corporation; and JOSHUA BOUCHER, an individual,**<br><br>**Defendants.** | **MEMORANDUM DECISION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br>**Case No. 2:10-cv-00933-DN**<br><br>**Judge David Nuffer** |

Davis County Deputy Sheriff Joshua Boucher ("Deputy Boucher") filed a Motion for Summary Judgment.[1]  The claims by Elizabeth Wood, Jerry Wood and Becky Wood (collectively "Plaintiffs") relate to the September 22, 2008 shooting of Brian Wood ("Mr. Wood") by Deputy Boucher during an arrest attempt.[2]

---

[1] Defendant Joshua Boucher's Motion for Summary Judgment ("Motion"), docket no. 78, filed December 7, 2011.

[2] Amended Complaint, docket no. 7, filed October 15, 2010.

# BACKGROUND[3]

### A.  *Early Morning Domestic Dispute*[4]

On the morning of September 22, 2008, Mr. Wood's wife, Elizabeth Wood ("Elizabeth"),

woke up to take a shower and get ready for the day.[5]  As Elizabeth was coming out of the

shower, Mr. Wood "came up from behind[,] . . . grabbed [her,] . . . threw [her] on the bed" and

proceeded to try and have sex with her.[6]  When Elizabeth tried to get away, Mr. Wood used

physical force to stop her,[7] and, at one point, "started punching [Elizabeth]."[8]  During this

confrontation, Jerry Wood ("Jerry"), Mr. Wood's father, called the house.  Mr. Wood answered

the call and told Jerry what had just occurred.[9]  Shortly after Jerry's phone call, Mr. Wood

"started getting out his guns and putting them in his pockets."[10]  At approximately 9:19 a.m.,

shortly after speaking with Jerry, Mr. Wood called 911 dispatch and told dispatch what he had

---

[3] The Memorandum in Support for Summary Judgment ("Supporting Memorandum") was filed under seal on December 7, 2011, docket no. 79.  A redacted and unsealed version of the same Supporting Memorandum was filed on December 13, 2011, docket no. 85.  The citations in this order are to the redacted version.

[4] Plaintiffs argue that the statements taken from Elizabeth Wood's interview—docket no. 85-7, attached as Exhibit F to the Supporting Memorandum—regarding what transpired during the morning events are hearsay.  *See* Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Opposing Memorandum") at 5–7, docket no. 93, filed January 20, 2012.  However, under FED. R. EVID. 801(d)(2)(A), Elizabeth's statements as to her own perceptions are an admission of a party opponent and are therefore not hearsay.  *See Plotke v. White,* 405 F.3d 1092, 1094 n.1 (10th Cir. 2005).  Plaintiffs further contend that Elizabeth's interview should not be considered because it is unsworn, however, the Tenth Circuit has allowed unsworn statements within a summary judgment context when the statements fall under the party opponent exception.  *See Weigel v. Broad,* 544 F.3d 1143, 1164 n.15 (10th Cir. 2008).  Although Plaintiffs do not bring up this same argument for Jerry Wood's interview—docket no. 85-9, attached as Exhibit H to the Supporting Memorandum—the same reasoning applies.

[5] Interview of Elizabeth Wood ("Elizabeth Wood's Interview") at 9:17–20; Supporting Memorandum at 11, ¶ 24; Opposing Memorandum at 6.

[6] Elizabeth Wood's Interview at 9:17–20; Supporting Memorandum at 11, ¶ 24.  The Opposing Memorandum does not discuss nor dispute many of the facts in the Supporting Memorandum.  Therefore, the Opposing Memorandum will be cited only when it acknowledges or disputes facts.

[7] Elizabeth Wood's Interview at 10:22–24; Supporting Memorandum at 11, ¶ 24.

[8] Elizabeth Wood's Interview at 13:1; Supporting Memorandum at 13, ¶ 24.

[9] Interview of Jerry Wood ("Interview of Jerry Wood") at 3:18–21; docket no. 85-9, attached as Exhibit H to Supporting Memorandum; Supporting Memorandum at 14, ¶ 28.

[10] Elizabeth Wood's Interview at 13:21–23; Supporting Memorandum at 13, ¶ 24.

done to his wife.[11]  After the 911 call, and while Mr. Wood was getting his guns, Jerry arrived at

Mr. Wood's home.[12]

When Jerry arrived, Mr. Wood "left the home[,] to the rear[,] and got into his Ford pick-

up truck."[13]  Jerry first "discuss[ed] the situation with Elizabeth" and then "went out and spoke

to [Mr. Wood] while he was locked in his truck, pleading with him to come out."[14]  While Jerry

pleaded with Mr. Wood, Mr. Wood "open[ed] the passenger window of the truck and fired a

single shot from one of the hand guns . . . into the utility trailer filled with trash that was located

in [Mr. Wood's] driveway, just west of his truck."[15]

B.  *Police Arrive*

At approximately 9:19 a.m. the Davis County dispatch notified the Farmington City

Police Department of the domestic dispute at the Wood residence.[16]  Officers arrived on scene

and observed Mr. Wood enter his vehicle, holding two handguns.[17]  Shortly after their arrival,

officers heard a gunshot.[18]

Deputy Boucher arrived on scene after receiving a backup request from the Farmington

Police Department.[19]  Upon his arrival, Deputy Boucher spent approximately two hours relaying

---

[11] Elizabeth Wood's Interview at 14:24–15:5; Supporting Memorandum at 13, ¶ 25; Opposing Memorandum at 6.

[12] Affidavit of Jerry Wood at 2, ¶ 4, attached as Exhibit A to Opposing Memorandum.

[13] *Id.* ¶ 5.

[14] *Id.* ¶ 6.

[15] *Id.* ¶ 7.

[16] Supporting Memorandum at 15, ¶ 20.

[17] *Id.* ¶ 32.

[18] *Id.* (This is the same gunshot referenced in the Early Morning Domestic Dispute section); Opposing Memorandum at 7.

[19] Supporting Memorandum at 16, ¶ 34.

information to other officers that were just arriving on scene.[20]  During those two hours, Deputy Boucher witnessed Mr. Wood, still in his vehicle, pointing a gun at his "father – as he would move it across[ ], so as it came up and over and then down out of . . . view."[21]  Officers attempted to convince Mr. Wood to exit his vehicle and surrender but Mr. Wood resisted officers' requests.[22]  To better facilitate negotiations, officers threw a phone into Mr. Wood's vehicle, but Mr. Wood refused to use the phone.[23]

C. *Afternoon Events*

After Mr. Wood refused to cooperate with officers or surrender, tear gas was eventually fired into Mr. Wood's vehicle.[24]  The tear gas caused Mr. Wood to exit his vehicle, but "he still had a gun with him and he was alternating [the gun] from being pointed to his head to his chest and back."[25]  During the tear gas deployment, sometime around noon, Deputy Boucher was relieved of his position of observing and providing information to other officers and asked to assist the tactical operations center.[26]  Mr. Wood stood by his vehicle for several hours, and during that time was asked "more than fifty (50) times to drop the gun or give up," but officers "never saw him drop the gun."[27]  Negotiations were unsuccessful during the afternoon.

---

[20] Deputy Boucher Dep. at 19:6–14, 20, docket no. 85-5, attached as exhibit D to Supporting Memorandum; Supporting Memorandum at 18, ¶ 37.

[21] Deputy Boucher Dep. at 22:17–21; Supporting Memorandum at 18, ¶ 38. Plaintiffs dispute this fact by citing to the Affidavit of Jerry Wood in which he states he did not notice Mr. Wood point the gun at him or at others. *See* Opposing Memorandum at 7.  The fact that Jerry did not notice Mr. Wood point the gun at anyone, however, does not mean, *ipso facto*, that it did not occur.  This is not a material factual dispute.

[22] Supporting Memorandum at 18–19, ¶¶ 39–40.

[23] Supporting Memorandum at 19, ¶ 40.

[24] *Id.* ¶ 42.

[25] *Id.*

[26] Deputy Boucher Dep. at 25:10–26:4; Supporting Memorandum at 19, ¶ 41.

[27] Supporting Memorandum at 20, ¶ 45.

D. *Evening Events*

At approximately 4 p.m. Deputy Boucher was assigned by the tactical operations center to be an advanced observer marksman, along with Officer Merino, Officer Marshall, and Officer Hudson.[28]  In the evening, after more than a twelve-hour standoff and several failed negotiation attempts, a deliberate action plan ("action plan") was agreed upon to achieve Mr. Wood's surrender.[29]  The action plan consisted of using less-lethal ammunitions, such as .40-mm foam baton rounds, pepper balls, taser, and noise flash diversionary devices, in an attempt to force Mr. Wood to drop his weapon.[30]  During the deployment of the action plan, Deputy Boucher, and the other advanced observer marksmen, were required to remain "in the position that [they] were in to provide cover for the teams that were up close and provide cover for the deliberate action teams when the plan was set in place and initiated."[31]

At the start of the action plan, noise flash diversionary devices were deployed and Mr. Wood was hit with pepper balls and foam baton rounds.  During these events, Mr. Wood was continuously ordered to drop his weapon.  Because the noise flash diversionary devices, the pepper balls and the foam baton rounds failed to achieve their purpose, Mr. Wood was then tasered.   Todd Barton ("Barton"), a non-officer eyewitness, Officer Justin Hudson ("Officer Hudson"), Detective Break Merino ("Detective Merino"), Officer Dustin Marshall ("Officer Marshall") and Deputy Boucher, each provided an account of what transpired during the time Mr. Wood was tasered and shortly before Mr. Wood was fatally shot:

---

[28] Deputy Boucher Dep. at 36:10–39:5; Supporting Memorandum at 22, ¶ 49. Plaintiffs dispute this fact, contending that there is no evidence that anyone in command actually assigned Deputy Boucher as an advanced observer marksman, instead Deputy Boucher volunteered.  Opposing Memorandum at 8.  This distinction is not material.

[29] Supporting Memorandum at 23, ¶ 51.

[30] *Id*.

[31] Deputy Boucher Dep. at 48:15–18 & 52:1–5; Supporting Memorandum at 23, ¶ 52.

(1) Barton

>     [H]e was hit [with the taser], and when he was hit, he went to his arms to
>     his chest.  And then when he – he dropped to his knees, and when he
>     dropped to his knees, his – his whole body just – I don't know if it was a
>     natural trying to catch himself, if he was going down or what, but his
>     body motion went to the gun in the hand to straight down to where the
>     gun was gone. . . . [H]is hands dropped to his sides as if he was catching
>     himself.  He raised his hands back up, and that's when I noticed that
>     there was – his hands were free. . . . He had nothing in his hands when he
>     dropped to his knees.[32]

(2) Officer Hudson:

>     He was pointing his handgun right at the team that I'd just left.  I didn't
>     know if they could see it or not.  I was going to acquire the best sight I
>     could and end the threat.[33]

(3) Detective Merino:

>     Detective Olsen came over the fence and deployed a taser, and I remember
>     thinking in my mind -- the exact thought was, what the hell are you doing,
>     because we don't do that with people.  We don't go after somebody with a
>     lethal weapon with a nonlethal tool.  You just don't do that, that's how cops
>     get killed. . . .  I could hear distinctly what Detective Olsen and everybody
>     was saying, [d]rop the gun.[34]  I could see the taser being used and he was
>     being told, [d]rop the gun.  And I remember him saying, I can't.  I thought,
>     okay.  So Detective Olsen turns the taser off and instead of dropping the
>     gun and just surrendering, he starts to turn back up towards EAT 2 and me
>     again with the gun.  And so Detective Olsen hit the taser again, and that's
>     when he kind of fell onto his butt, but he still had the gun up pointed in my
>     direction.  And it looked like he was trying to push his arms out into a two-
>     handed firing grip.  And when I saw that, that's in my mind where I decided
>     enough was enough.[35]

---

[32] Barton Dep. at 85:25–86:21, attached as Exhibit E to Opposing Memorandum.

[33] Officer Hudson Dep. at 118:8–11, docket no. 85-14, attached as Exhibit M to Supporting Memorandum; Supporting Memorandum at 24, ¶ 54.

[34] This directive does not constitute hearsay because it does not involve an assertion.  *See United States v. Shepherd*, 739 F.2d 510, 514 (10th Cir. 1984) ("An order or instruction is, by its nature, neither true nor false and thus cannot be offered for its truth. The orders or instructions were offered to show that they occurred rather than to prove the truth of something asserted." (internal citations omitted)).

[35] Detective Merino Dep. at 91:2–92:21, docket no. 85-10, attached as Exhibit I to Supporting Memorandum.

(4) Officer Marshall

> I was very very nervous and I had actually come to the decision that this had gone on too long, as far as with the gun being pointed in our direction. Officers moving in closer. Essentially he's surrounded by officers. If he starts shooting, good chance he's gonna hit someone, just – not even aiming, just that he's going to shoot. So I had actually started sliding out from behind the bunker more, lining up my sights, I was checking the back drop, make sure none of our officers were in the way and I had actually decided I was now gonna take lethal force against him.[36]

(5) Deputy Boucher:

> There was a lot of communications. There was a lot of yelling to [Mr. Wood] to drop the gun. There was a lot of communication that he still had the gun with him. He continued to move forward from that position, he moved forward about ten yards to where he came to a stop and went down to his knees in front of me. . . . I recall hearing Marshall saying that, "He's pointing a gun at us, he's pointing a gun at us."[37] At that time I'd had the rifle up to my shoulder and I brought it up. Sometime to that point I'd heard what I thought was a gunshot. I had heard another individual say that a shot was fired. When I heard that, I thought that another officer had been hit. That's when I started to bring my rifle up and based off of that information, I felt like [Mr. Wood] was an immediate threat, that he was trying to shoot somebody.[38]

Ultimately, Detective Merino, Officer Hudson, Officer Marshall and Deputy Boucher each independently perceived an immediate threat and decided to use lethal force to stop Mr. Wood. Deputy Boucher was the first to fire his weapon and killed Mr. Wood.[39]

## DISCUSSION

### A. *Summary Judgment Standard*

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law."[40] When

---

[36] Officer Marshall Dep. at 56:1–11, docket no. 85-11, attached as Exhibit J to Supporting Memorandum.

[37] This qualifies as an excited utterance under FED. R. EVID. 803(2) ("A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.").

[38] Deputy Boucher Dep. at 57:12–59:8; Supporting Memorandum at 29.

[39] *Id.* at 64.

applying this standard, the entire record is viewed "in the light most favorable to the party opposing summary judgment."[41]   "However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."[42]   Likewise, "[a]ffidavits or other evidence offered by a nonmovant must create a genuine issue for trial; viewing the evidence in the light most favorable to the nonmovant, it is not enough that the evidence be 'merely colorable' or anything short of 'significantly probative.'"[43]   "[O]nly *material* factual disputes preclude summary judgment; factual disputes about immaterial items are irrelevant."[44]

### B.   *42 U.S.C. § 1983 Deprivation of Constitutional Rights Claim*

Deputy Boucher asserts that he is entitled to summary judgment under the doctrine of qualified immunity.  When such a defense is raised, the burden shifts to the plaintiff, who must overcome a heavy two-part burden.[45]   "To prevail . . . a 'plaintiff must show that (1) the official violated a constitutional or statutory right; and (2) the constitutional or statutory right was clearly established when the alleged violation occurred.'"[46]

### (1) *First Prong*

Whether Deputy Boucher's use of deadly force against Mr. Wood violated a constitutional or statutory right is analyzed "under the Fourth Amendment, which guarantees

---

[40] FED. R. CIV. P. 56(c).

[41] *Durham v. Herbert Olbrich GMBH & Co.*, 404 F.3d 1249, 1250 (10th Cir. 2005).

[42]  *Applied Genetics International, Inc. v. First Affiliated Securities, Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).

[43] *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)).

[44] *Id.* (emphasis in original).

[45] *See Phillips v. James*, 422 F.3d 1075, 1080 (10th Cir. 2005).

[46] *Mimics, Inc. v. Village of Angel Fire*, 394 F.3d 836, 841 (10th Cir. 2005) (quoting *Verdecia v. Adams*, 327 F.3d 1171, 1174 (10th Cir. 2003)).

citizens the right to be free from unreasonable searches and seizures."[47]  A reasonableness

determination "requires a careful balancing of the nature and quality of the intrusion on the

individual's Fourth Amendment interests against the countervailing governmental interests at

stake."[48]  The United States Supreme Court in *Graham v. Conner* laid out factors that courts

should consider in a reasonableness inquiry.[49]  The *Graham* factors include "the severity of the

crime at issue, whether the suspect poses an immediate threat to the safety of the officers or

others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[50]  "As

with all reasonableness inquiries[, however,] the touchstone is the totality of the

circumstances."[51]  Furthermore, whether an officer's use of force is reasonable is measured

"from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

hindsight."[52]  "The calculus of reasonableness must embody allowance for the fact that police

officers are often forced to make split-second judgments—in circumstances that are tense,

uncertain, and rapidly evolving—about the amount of force that is necessary in a particular

situation."[53]

---

[47] *Blossom v. Yarbrough*, 429 F.3d 963, 967 (10th Cir. 2005) (citing *Terry v. Ohio*, 392 U.S. 1, 8 (1968)).  Plaintiffs contend that Deputy Boucher violated Mr. Wood's constitutional rights under the Fourth and Fourteenth Amendment.  As a preliminary matter, Plaintiffs' Fourteenth Amendment due process claim is dismissed because the United States Supreme Court has held that "*all* claims that law enforcement officers have used excessive force— deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original).  Plaintiffs seem to concede this much, for their Memorandum in Opposition to Summary Judgment focuses solely on the Fourth Amendment.  Thus, Plaintiffs' claim will be analyzed under the objective reasonableness standard of the Fourth Amendment.

[48] *Graham,* 490 U.S. at 386 (internal quotations and citation omitted).

[49] *Id.*

[50] *Id.*

[51] *Phillips*, 422 F.3d at 1080 (citing *Graham*, 490 U.S. at 396).

[52] *Graham*, 490 U.S. at 396.

[53] *Id.* at 396–97.

Plaintiffs claim that there are disputed issues of material facts—regarding the objective reasonableness of Deputy Boucher's use of deadly force—which preclude the grant of summary judgment.  Plaintiffs assert that Deputy Boucher acted in an objectively unreasonable manner both during the events leading up to the use of lethal force and at the time of the actual shooting.

*(a) Events Prior to the Shooting*

Plaintiffs contend that Deputy Boucher's actions prior to using lethal force were objectively unreasonable.[54]  "The reasonableness of the officers' use of force depends not only on whether they believe they were in danger at the time but also on whether their 'own reckless or deliberate conduct during the seizure unreasonably created the need to use such force.'"[55]  An officer's conduct leading up to the use of deadly force is only relevant, however, if it is "immediately connected" to the threat of force.[56]  Moreover, the officer's conduct must rise to the level of recklessness to be actionable.[57]  Courts are required to consider the totality of the circumstances in their reasonableness inquiry.[58]

Plaintiffs contend that "[Deputy] Boucher did not have an operating radio, was not wearing his glasses he needed at night and his mind was racing because of the plan his superior officers put into effect."[59]  Plaintiffs say these facts require the court to find Deputy Boucher's actions, prior to his use of deadly force, reckless.  Plaintiffs offer no authority for this assertion.  Although not having an operating radio nor wearing one's prescription glasses might be

---

[54] Opposing Memorandum at 25.

[55] *Thomns v. Salt Lake County*, 584 F.3d 1304, 1320 (10th Cir. 2009) (quoting *Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997)).

[56] *See Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001) (quoting *Allen*, 119 F.3d at 840).

[57] *See Sevier v. City of Lawrence, Kansas*, 60 F.3d 695, 699 n.7 (10th Cir. 1995) ("Mere negligent actions precipitating a confrontation would not . . . be actionable under § 1983.").

[58] *See Medina*, 252 F.3d at 1132.

[59] Opposing Memorandum at 22.

imperfect behavior, these facts do not demonstrate that Deputy Boucher acted in a reckless manner *which created the need to use such deadly force*.

    (b) *Time of Shooting*

    Plaintiffs set forth a list of "Disputed Facts"[60] for their argument that Deputy Boucher's use of lethal force was objectively unreasonable.  Reviewing those facts in light of the *Graham* inquiry for reasonableness, it is clear that two of the factors are not in dispute, namely, the severity of the crime at issue and Mr. Wood's active resistance.  Plaintiffs do not dispute that Mr. Wood actively resisted arrest.  Also, the crime at issue was severe.  The police were originally dispatched to the Wood residence regarding a domestic violence situation which alone can be considered severe.  Mr. Wood, however, increased the severity of his crime by (1) firing into a utility trailer while in his vehicle, (2) making hostile motions with his gun—moving it from side to side and also aiming it at himself, and (3) during the twelve-hour standoff, refusing to drop his weapon and surrender—even after officers used less-lethal ammunitions, such as .40-mm foam baton rounds, pepper balls, taser, and noise flash diversionary devices.

    Therefore, Plaintiffs dispute only one *Graham* factor — whether Mr. Wood posed an immediate threat to the safety of the officers when he was shot.  Plaintiffs assert that Mr. Wood did not pose an immediate threat to anyone because he did not have a gun in his hand at the moment he was fatally shot.[61]  Plaintiffs rely on the deposition of Barton, an eyewitness, who

---

[60] *Id.* at 2–13 and 22–24.

[61] *Id.* at 16.  Plaintiffs dispute that Mr. Wood fired his gun immediately before he was shot.  *See* Opposing Memorandum at 12.  Because the entire record is viewed in the light most favorable to the party opposing summary judgment, this disputed fact is disregarded for purposes of this decision.

testified that Mr. Wood "did not have a gun in his hand when Deputy Boucher . . . shot and killed [Mr. Wood]."[62]

In his deposition, Barton testified that he went across the street, and into a building, so he could have a better view of the situation.[63]  Barton testified that during the police action plan he saw Mr. Wood holding a gun.  When asked which hand the gun was in, Barton testified that Mr. Wood had the gun in his "right hand and then at one point in his left hand."[64]  When asked what he observed when Mr. Wood was tasered, Barton stated that Mr. Wood dropped to his knees, but tried to catch himself, and afterward Mr. Wood raised his hands and, Barton noticed Mr. Wood was no longer holding a gun.[65]

As further evidence for their assertion that Mr. Wood did not have a gun in his hand at the moment he was shot, Plaintiffs point out that there was no gun in Mr. Wood's hand when officers approached Mr. Wood's body.[66]  Plaintiffs refer to Officer Hudson's deposition on this point.[67]  Plaintiffs correctly point out that Officer Hudson testified that he did not see a gun in Mr. Wood's *hand* when he approached the body; however, Plaintiffs fail to mention that Officer Hudson saw the gun, on the ground, next to Mr. Wood's hand.[68]

Plaintiffs further claim that "Officer Marshall testified that he doesn't have any recollection of seeing [Mr. Wood's] . . . gun in his hand or anywhere else after he was shot."[69]

---

[62] *Id.* at 10.

[63] Barton Dep. at 60:8–15.

[64] *Id.* at 70:21–25.

[65] *Id.* at 85:25–86:7.

[66] Opposing Memorandum at 12.

[67] Officer Hudson Dep. at 108:21–24, attached as Exhibit F to Opposing Memorandum.

[68] *Id.* at 108:21–109:6.

[69] Opposing Memorandum at 12.

Plaintiffs' argument mischaracterizes Officer Marshall's testimony.  Officer Marshall was not asked whether he saw the gun, but whether he "recalls where the [.45] Kimber was at the time [he] saw [Mr. Wood's] body."[70]

Whether Mr. Wood had a gun in his hand when he was shot does not determine whether Mr. Wood posed an immediate threat to the safety of the officers when he was shot.  As in *Phillips v. James*, "Plaintiffs' argument relies heavily on the 'precise moment' factor."[71] However, "strict reliance on just one factor when the totality must be considered is inappropriate."[72]

Although the precise moment Mr. Wood was shot is an important factor, "the events leading up to that moment are also extremely relevant" in determining whether Mr. Wood posed an immediate threat.[73]   The Tenth Circuit has provided a non-exhaustive list of factors to consider when assessing the degree of threat an individual posed to officers: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect."[74]

The circumstances, viewed in the light most favorable to Plaintiffs, show that (1) throughout the twelve-hour standoff, officers continually ordered Mr. Wood to drop his weapon and surrender, yet Mr. Wood continually resisted; (2) throughout the day, Mr. Wood made

---

[70] Officer Marshall Dep. at 211:23–24, attached as Exhibit H to Opposing Memorandum.

[71] 422 F.3d at 1083.

[72] *Id.*

[73] *Id.*

[74] *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

hostile motions with the gun—motioning the gun from side to side; (3) there were many officers surrounding and in close proximity to Mr. Wood;  and (4) having previously fired his weapon, Mr. Wood's manifest intentions were unknown to officers.

These circumstances indicate that Mr. Wood posed a significant threat and "from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force" in this case.[75]  It is uncontested that three separate officers at the scene, each assigned as an advanced observer marksman, made an independent decision to take lethal force against Mr. Wood at the same time that Deputy Boucher shot Mr. Wood because of their perceptions of an immediate threat.  This supports the determination that Deputy Boucher's use of deadly force was objectively reasonable and justified.[76]

Even if the evidence established that Mr. Wood was unarmed at the moment he was shot, this district has previously held, and the Tenth Circuit has affirmed, that is it "not unreasonable for the officers to believe that [the individual] posed a serious threat of physical harm when he was moving in violation of the officers' orders and his gun remained in close reach."[77]  Even under Plaintiffs' view, the gun was at least within close reach, if not in Mr. Wood's hand, when he was shot.  Barton, the witness most favorable to the Plaintiffs, testified that Mr. Wood had the gun in his hand shortly before being shot.  Barton also testified that Mr. Wood was moving his hands prior to being shot.  The circumstances surrounding the shooting establish that Deputy

---

[75] *Id.*

[76] *See e.g.*, *Graham* 490 U.S. at 396 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene . . . ."); *Phillips*, 422 F.3d at 1080 ("[A]n officer's use of force must be reasonable, which is measured from the perspective of a reasonable officer on the scene.") (internal quotations and citation omitted); *Estate of Larsen*, 511 F.3d at 1260 (emphasis in original) ("[I]f a reasonable officer in Defendants' position would have had probable cause to believe that there was a *threat of serious physical harm to themselves* or to others.").

[77] *See Turnbow v. Ogden City*, No. 1:07–cv–114TC, 2009 WL 735024, at *5 (D. Utah Mar. 18, 2009), *aff'd* 386 Fed. Appx. 749 (10th Cir. 2010).

Boucher was presented with a "tense, uncertain, and rapidly evolving situation that we do not like to second-guess using the 20/20 hindsight found in the comfort of a judge's chambers."[78] Even if "'an officer reasonably, but mistakenly, believed that a suspect was likely to fight back the officer would be justified in using more force than in fact was needed.'"[79]  From the beginning, Mr. Wood was given every opportunity during the twelve-hour standoff to exit his vehicle and comply with officers' commands, instead he refused to drop his weapon — even when hit with baton rounds, pepper balls, and tasered — creating a threatening situation for the officers.

Under the circumstances, it was not unreasonable for Deputy Boucher to believe that Mr. Wood posed a serious threat of physical harm.[80]  Thus, Plaintiffs have not satisfied the first prong of the qualified immunity analysis because they have failed to demonstrate that Deputy Boucher's use of lethal force was objectively unreasonable and in violation of the Fourth Amendment.

(2) *Second Prong*

Review of the second prong of the qualified immunity analysis (whether the constitutional or statutory right was clearly established when the alleged violation occurred) is not necessary.  "If the plaintiff fails to meet his or her burden on [the] threshold inquiry, the qualified immunity inquiry comes to an end."[81]  Here, Plaintiffs have not satisfied the first part of

---

[78] *Phillips*, 422 F.3d at 1084.

[79] *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)).

[80] *See Phillips,* 422 F.3d 1075, 1084 (10th Cir. 1995) (finding "there was no reason for [Defendant] to have to wait to be shot at or even see [the Decedent] raise a gun and point it at him," when the circumstances established a high degree of threat to officers).

[81] *Jiron*, 392 F.3d at 414.

the qualified immunity inquiry; therefore, there is no need to address the second inquiry.[82]

Accordingly, Deputy Boucher is protected by qualified immunity.

    *C. Violation of Article I, §§ 1, 7, 14, and 15 of the Utah Constitution*

    Plaintiffs argue that Deputy Boucher violated their constitutional rights under the Utah

Constitution, article I, sections 7, 9, and 14.[83]  Utah does not have a counterpart statute to 42

U.S.C. § 1983 and the Utah Constitution does not expressly provide damage remedies for

constitutional violations.  "As a result, a plaintiff's remedy for state constitutional violation rests

in the common law."[84]  In order to recover monetary damages for a constitutional violation, the

Utah Supreme Court requires a plaintiff to:

> [D]emonstrate that the provision violated by the defendant is self-executing
> and then [the plaintiff] must establish three elements: (1) the plaintiff
> "suffered a flagrant violation of his or her constitutional rights;" (2)
> "existing remedies do not redress his or her injuries;" and "(3) equitable
> relief, such as an injunction, was and is wholly inadequate to protect the
> plaintiff's rights or redress his or her injuries."[85]

    Because Plaintiffs seek monetary damages for the alleged violations of their state

constitutional rights, the above analysis applies.  Deputy Boucher contends that "Plaintiffs have

not demonstrated . . . that the constitutional provisions alleged . . . are self-executing,"[86] and

further argues that the "Utah Constitutional claims related to monetary damages fail on the first

---

[82] *See e.g., Holland ex rel. Overdorff v. Harrington,* 268 F.3d 1179, 1186 (10th Cir. 2001) (explaining that a plaintiff's failure to establish the first prong is sufficient grounds for granting qualified immunity); *Albright v. Rodriguez,* 51 F.3d 1531, 1534–35 (10th Cir. 1995) (stating that if the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant qualified immunity).

[83] Opposing Memorandum at 28.

[84] *Jensen ex rel. Jensen v. Cunningham*, 2011 UT 17, ¶ 57, 250 P.3d 465, 480.

[85] *Id.* at ¶ 48, 250 P.3d at 478 (quoting *Spackman ex rel. Spackman v. Board of Education of the Box Elder County School District,* 2000 UT 84, ¶¶ 19–20, 16 P.3d 533, 537–39).

[86] Supporting Memorandum at 58.

[*Spackman*] element [Plaintiffs] must show the Court."[87] These two arguments are addressed in turn.

(1) *Self-Executing*

Plaintiffs must first demonstrate that article I, sections 1, 7, and 14 are self-executing. "[A] constitutional provision is self-executing if it articulates a rule sufficient to give effect to the underlying rights and duties intended by the framers[ ] . . . and if no ancillary legislation is necessary to the enjoyment of a right given, or the enforcement of a duty imposed."[88]  The Utah Supreme Court, in *Jensen*, has recognized that article I, sections 1, 7, and 14 are self-executing; therefore Plaintiffs have cleared the first *Spackman* hurdle.[89]

(2) *Monetary Damages*

Deputy Boucher next argues that "Plaintiffs' Utah Constitutional claims related to monetary damages fail on the first [*Spackman*] element. . . . Plaintiffs did not sustain a 'flagrant' violation of their Constitutional rights."[90]  To establish a flagrant violation of one's constitutional rights:

> [D]efendant must have violated clearly established constitutional rights of which a reasonable person would have known.  To be considered clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  The requirement that the unconstitutional conduct be flagrant ensures that a government employee is allowed the ordinary human frailties of forgetfulness, distractibility, or misjudgment without rendering him or herself liable for a constitutional violation.[91]

---

[87] *Id.*

[88] *Spackman,* 2000 UT at ¶ 7, 16 P.3d at 535 (internal quotations and citation omitted).

[89] *See Jensen*, 2011 UT at ¶¶ 59–64, 250 P.3d at 481–83.

[90] Supporting Memorandum at 58.

[91] *Spackman*, 2000 UT at ¶ 23, 16 P.3d at 538 (internal quotations and citation omitted).

Plaintiffs contend that "[t]he fact that [Deputy] Boucher claims he was justified in using lethal force does not somehow convert his unlawful killing of [Mr. Wood] into something that is less than 'flagrant' under Utah law."[92]  Plaintiffs further assert that "[i]t is bewildering to think that killing an unarmed man who is being tased could be something less than a flagrant violation of the Utah Constitution."[93]  Deputy Boucher argues that he was not acting in a flagrant manner, because he "acted in an objectively reasonable manner when he shot [Mr. Wood] because Deputy Boucher feared for the safety of other officers and for his own life."[94]  The Utah Supreme Court has noted that there "cannot be a flagrant violation . . . if there was a reasonable basis to warrant the particular intrusion."[95]

Deputy Boucher had a reasonable basis for taking lethal force against Mr. Wood.  Deputy Boucher was responding to what he perceived to be an immediate threat to himself and other officers.  As discussed above in the section 1983 analysis, it was not objectively unreasonable for Deputy Boucher to believe that Mr. Wood posed a serious threat of physical harm.  Accordingly, Plaintiffs have failed to establish that they suffered a flagrant violation of their Utah constitutional rights.

### D.  Intentional Infliction of Emotional Distress

A claim for intentional infliction of emotional distress must be supported by facts that demonstrate that Deputy Boucher "intentionally engaged in some conduct toward the plaintiffs, (a) with the purpose of inflicting emotional distress, or, (b) where any reasonable person would

---

[92] Opposing Memorandum at 28.

[93] *Id.*

[94] Reply Memorandum in Support of Deputy Boucher's Motion for Summary Judgment ("Reply Memorandum") at 35, docket no. 106, filed February 10, 2012.

[95] *Jensen*, 2011 UT at ¶ 98, 250 P.3d 488.

have known that such would result."[96]  Also, the facts must demonstrate that Deputy Boucher's

actions "are of such a nature as to be considered outrageous and intolerable in that they offend

against the generally accepted standards of decency and morality."[97]

Deputy Boucher argues that Plaintiffs' intentional infliction of emotion distress claim

fails in these circumstances because his actions were not directed towards Plaintiffs but were

towards Mr. Wood.  Deputy Boucher further argues that none of his "actions were done with the

intention of causing emotional distress"[98] to Plaintiffs, and "the single shot taken by [him] . . .

under the circumstances [where an immediate threat was perceived] was not of such a nature 'as

to be considered outrageous and intolerable.'"[99]

Plaintiffs do not address Deputy Boucher's arguments directly; Plaintiffs' arguments

assume that Deputy Boucher's actions were a "deliberate violation of [Mr. Wood's] . . .

constitutional right to be free from the use of lethal force without cause."[100]  Plaintiffs' claim is

not viable because "an actor exercising legal rights is not liable . . .  merely for exercising those

rights."[101]  Deputy Boucher was fulfilling his legal duty and exercising his legal right to protect

himself and others from the immediate threat Mr. Wood presented.  "The idea that an actor is

protected by exercising a legal right is a narrower but comparable concept to the defense of

privilege employed for other intentional torts."[102]

---

[96] *Franco v. The Church of Jesus Christ of Latter-Day Saints*, 2001 UT 25, ¶ 25, 21 P.3d 198, 206 (internal quotations and citation omitted).

[97] *Id.*

[98] Supporting Memorandum at 60.

[99] *Id.*

[100] Opposing Memorandum at 30.

[101] Restatement (Third) of Torts § 46 cmt. e (2012).

[102] *Id.* § 46 reporters' notes, cmt. e.

In addition, Plaintiffs' claim for intentional infliction of emotional distress fails because "a person cannot recover intentional infliction of emotional distress damages based on outrageous conduct visited upon a family member without [plaintiff] being present when the conduct took place."[103] Plaintiffs argue that the exception to the presence requirement, recognized in *Hatch v. Davis*,[104] applies. The *Hatch* court, in considering whether conduct triggers the exception, provided a four factor test: "(1) the relationship of the target of the conduct to the plaintiff, (2) the relationship between the person committing the conduct and the plaintiff, and (3) the egregiousness of the conduct. Finally, (4) a plaintiff must establish that the conduct was undertaken, in whole or in part, with the intention of inflicting injury to the absent plaintiff."[105] "This much should be clear at the outset: the bar is high,"[106] and the exception only applies "under particularly compelling circumstances."[107]

The last two *Hatch* factors are not met. Because Deputy Boucher's actions were taken in response to an immediate threat to himself and other officers, consistent with his law enforcement duty, his actions were not egregious. Further, Plaintiffs have no evidence that Deputy Boucher's conduct was undertaken with the intention of inflicting injury to the Plaintiffs. Deputy Boucher reasonably believed that Mr. Wood posed an immediate threat and his actions were taken with the intent of stopping the threat. Accordingly, Deputy Boucher is entitled to judgment as a matter of law on this claim.

---

[103] *Hatch v. Davis,* 2006 UT 44, ¶ 16, 147 P.3d 383, 386.

[104] *Id.*

[105] *Id.* at ¶ 27, 147 P.3d at 388.

[106] *Id.* at ¶ 28, 147 P.3d at 388.

[107] *Id.* at ¶ 26, 147 P.3d at 388.

**ORDER**

For the reasons stated above, IT IS HEREBY ORDERED that Defendant Deputy Boucher's

Motion for Summary Judgment[108] is GRANTED.


      Dated this 16th day of November, 2012.

                    BY THE COURT

                    _____

                    Judge David Nuffer
                    U.S. District Court

---

[108] Docket no. 78.